IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ROB BOELK, JERRY SEGER,
DAVE JACAK, GREG CONGDON
and DAVID MOFFITT,

                                  OPINION AND ORDER

                Plaintiffs,

                                    12-cv-40-bbc

        v.

AT&T TELEHOLDINGS, INC.,
WISCONSIN BELL, INC., AMERITECH
SERVICES, INC. and AT&T SERVICES, INC.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiffs Rob Boelk, Jerry Seger, Dave Jacak, Greg Congdon and David Moffitt contend that defendants AT&T Teleholdings, Inc., Wisconsin Bell, Inc., Ameritech Services, Inc. and AT&T Services, Inc. violated the Fair Labor Standards Act (FLSA) and Wisconsin wage laws by failing to pay wages for meal breaks during which plaintiffs worked. In addition, plaintiffs contend that defendants violated the FLSA and Wisconsin law by failing to keep accurate records of the time plaintiffs worked. Defendants have filed a motion for summary judgment that is now before the court. Dkt. #125. Defendants contend that they are entitled to judgment on all of plaintiffs' claims because plaintiffs cannot prove that they performed any work during their lunch breaks and even if they could, they cannot prove that defendants knew about it. Defendants also argue that there is no private cause of action for plaintiffs' recordkeeping claims.

1

I am granting defendants' motion in full.  Plaintiffs failed to respond to defendants' arguments regarding the recordkeeping claims.  Thus, plaintiffs waived any argument in opposition to dismissal of those claims.  Bonte v. U.S. Bank, N.A., 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").  With respect to their claims under the FLSA and Wisconsin wage laws, plaintiffs have not submitted evidence from which a jury could find that defendants knew or should have known that plaintiffs were performing any work during their meal breaks for which they were not compensated.  Without such evidence, defendants cannot be liable for failing to pay plaintiffs for such work.  Therefore, defendants are entitled to summary judgment on all plaintiffs' claims.

Plaintiffs filed a motion for leave to file a sur-reply, dkt. #153, which I am denying. In the proposed sur-reply, plaintiffs rehash arguments they made in their brief in opposition and raise new arguments about why the court should consider previously undisclosed estimates they calculated of the their unpaid overtime work.  The rehashed arguments are not appropriate material for a sur-reply and I did not need to consider the estimates in order to resolve defendants' motion for summary judgment.

From the parties' proposed findings of fact and the record, I find the following facts to be material and undisputed.

UNDISPUTED FACTS

A.  The Parties

Defendants AT&T Teleholdings, Inc., Wisconsin Bell, Inc., Ameritech Services, Inc.

2

and AT&T Services, Inc are telecommunications companies operating a network of long-distance telephone, internet and television service for business and residential customers throughout the country.  (The parties do not distinguish among defendants, so I will refer to them collectively as "defendants" throughout this opinion.)

Plaintiffs Rob Boelk, Jerry Seger, Dave Jacak, Greg Congdon and David Moffitt are former and current employees of defendants who worked within three departments: Installation and Repair, Construction and Engineering and U-Verse.  Installation and Repair technicians install and repair of telephone, cable and internet service for customers. Construction and Engineering technicians work predominantly as cable splicers; and U-Verse technicians are responsible for the wiring between a customer or residential building and outside telephone poles.  Plaintiffs worked primarily in the field and spent most of their shifts working independently, outside the direct observation of their supervisors.

### B.  Defendants' Efficiency Ranking and Dispatch Systems

Defendants have policies encouraging efficient and quality work, including a performance system that falls under defendants' "Management System and Operating Control System."  Under the performance system, technicians receive efficiency scores that are based in part on the expected and actual time it takes them to complete particular assignments.  Defendants post the technicians' monthly scores at garages in ranked order. A ranking in the bottom 20% three times in a 90-day period can put a technician onto a performance improvement plan and ultimately, corrective action.

Defendants track the technicians' locations throughout the day using a GPS Vehicle

Tracking System.  GPS devices in the technicians' vehicles report where each vehicle goes, how fast it goes, where and how long it stops and whether it is idling or the ignition is turned off.  A GPS report shows a vehicle's start time and locations and the movement of the vehicle and duration of the stops.  The reports could be used to identify inefficiencies in travel and work methods and other aspects of productivity.

Installation and Repair and U-Verse technicians use a "Global Craft Access System" in their vehicles that is intended to track when they are dispatched on a job and when they complete it.  The system has a "lunch dispatch" option that allows a technician to select whether he is taking a lunch or took a lunch during a dispatched job.  The default selection is "no" and technicians have to affirmatively check the lunch button to select "yes."  Some technicians rarely use the button.  Congdon Dep., dkt. # 72, at 126 ("Q. So you don't pay attention to the lunch, yes, no, each job?  A.  No.  I was told that button doesn't do anything. . . . Q: So you just don't use it?  A.  No."); Jacak Dep., dkt. #75, at 155-156 ("You can hit the button, it doesn't tell you if you're on lunch or not . . . .  Doesn't say you are on lunch, you are off lunch or how many minutes you're on lunch.  It doesn't say nothing.  We don't know.   Most people don't hit it."); Moffitt Dep., dkt. #73, at 95 (testifying he used designation "[w]hen I remember[ed] to").  The button was designed to allow managers to know why a job took longer than expected on the dispatch system.  The Global Craft Access System generates a report that includes a summary of the lunch "yes" and "no" results for the day and is sent to the Management System and Operating Control System.  Supervisors can access these reports. The reports generally show more "no" than "yes" responses.  The information from the "lunch yes or no" buttons is not sent to payroll and has no impact on

4

a technicians' timekeeping.

C.  <u>Defendants' Timekeeping and Meal Break Policies and Guidelines</u>

Defendants' policies require technicians to report accurately and be paid for all hours worked.  The policies identify work performed during lunch periods as an example of work that must be reported. Company policies prohibit managers from requiring or permitting nonexempt employees to work "off the clock" and state that failure to accurately report and pay overtime for nonexempt employees violates the law.

Under company policies and the collective bargaining agreement that applies to Wisconsin technicians, plaintiffs are required to take an unpaid meal break at some point during the day.  The length of the daily meal break depends on the department in which the technician works.  Technicians in Construction and Engineering and U-Verse have one 30-minute meal break each shift.  In January 2010, the meal break for Installation and Repair technicians was extended from 30 to 45 minutes.  Technicians do not clock in and out for meals and are not required to report to payroll the times they actually start and end their meal breaks.  Defendants do not track technicians' meal breaks with the GPS system.

Defendants provide technicians guidelines on how they are allowed to use meal break time.  Dkt. #36-7 (Installation and Repair, Construction and Engineering); #36-8 (U-Verse).  Under the guidelines, technicians cannot drive "off route" between one job to the next, cannot use company vehicles for personal business without authorization and cannot nap in the vehicles.  They may not idle company vehicles solely for personal comfort, such as to heat or cool the vehicle, but may idle vehicles for safety or health reasons.  Technicians

5

can meet with each other for lunch, but the guidelines state that no more than two company vehicles can be parked at the same establishment.  Technicians have been disciplined for violating some of the guidelines, including driving out of route and sleeping in their vehicles.


### D.  Named Plaintiffs

All of the named plaintiffs testified that they were aware of and understood that defendants' policies required them to report their time accurately and to take a 30 or 45 minute unpaid lunch break.  They also understood that if they worked during their lunch breaks, they were supposed to report it.  They understood that if they reported their lunch time work, they would be paid for it.


### 1.  Jerry Seger

Seger worked as an Installation and Repair Customer Service Specialist out of the Stevens Point garage under December 2011.  At his deposition, Seger testified that he does not normally take a lunch break and instead eats while he is driving from job to job.  He has taken partial lunch breaks on occasion, but he does not think he has ever taken a complete 30 or 45-minute lunch.  Seger Dep., dkt. #71, at 34-35.  On some occasions, Seger claimed pay for working through his lunch.  On other occasions, Seger reported taking lunch breaks, knowing it was untrue, because he believed that it would help his efficiency scores and because he did not need very much time to eat his lunch.  Seger Decl., dkt. #33, at ¶ 29. Seger never told a manager what he did or did not do during his meal breaks and did not keep a record of what he did or did not do during his breaks.  Seger Dep., dkt. #71, at 33.

6

He testified that he knows of no way to determine when he took a partial or full lunch break. Id. at 36 ("I don't think it's realistic for you to ask me to remember when I did and didn't take lunch breaks.").

2. Greg Congdon

Plaintiff Congdon is currently an Installation and Repair technician; previously, he worked in Construction and Engineering. He has always worked out of a Stevens Point location. Congdon states in his declaration that since 2009, he has "rarely taken a full 30- or 45- minute lunch break." Congdon Decl., dkt. #30, at ¶ 24. He often ate over the course of the day while driving from job to job rather than stopping and breaking for lunch, and usually deducted his lunch break even if he worked through it. On some occasions, he called his supervisor for permission to work through lunch. If permission was given, Congdon left early at the end of the day and was paid for working through lunch. At one point, Congdon had "blanket permission" from his supervisor to work through lunch and leave early. During that time, he reported his time and would be paid. Congdon Dep., dkt. #72, at 68-69. Congdon knows of no way to determine which days he did not take a full 45-minute lunch. Id. at 51-52, 115.

3. David Moffitt

Plaintiff Moffitt works in Installation and Repair out of the Beaver Dam garage. Moffitt testified that 30% of the time he either did not work during lunch breaks or took no breaks at all; 70% of the time he took lunch breaks but did some work during them; and

20% of the time he worked through lunch and would leave work 45 minutes early and receive pay for all eight hours of the day.  Moffitt Dep., dkt. #73, at 125; Moffitt Decl., dkt. #32, at ¶ 20.  As to those lunch breaks when he worked, he worked anywhere from one minute to 40 minutes.  On one or two occasions, Moffitt told his manager Duane Amundson that he needed to work during lunch, and Amundson approved the request and Moffitt was paid for that time.  Moffitt Dep., dkt. #73, at 82-83.  Moffitt testified there is no way to know how much time he spent working on each break and that the only way to sort out his lunch breaks would be "if God came down . . . and gave you a premonition about it."  Id. at 107-08, 126.  Moffitt testified that management would know if he did not have a lunch break only if someone happened to be watching him, or if there were "surveillance equipment" installed in his truck.  Id. at 108-110.


4.  Dave Jacak

        Plaintiff Dave Jacak began working for defendants in October 2006 and has worked in Installation and Repair and Construction and Engineering.  He currently works in Milwaukee.  Jacak testified that if he wants to work overtime, including through his lunch, he is supposed to call his manager and seek approval.  Jacak Dep., dkt. #75, at 57.  He has received warnings for working through lunches without prior management approval.  When Jacak worked in Construction and Engineering, he could get management approval to work through lunch and leave work 30 minutes early.  Under those circumstances, Jacak would receive pay for all eight hours of work.  Jacak testified that in Installation and Repair, he

8

"definitely" takes a lunch break, though he is interrupted frequently by managers, contractors and other technicians.  Id. at 59.


5.  Rob Boelk

Plaintiff Rob Boelk currently works in Installation and Repair and has always worked out of the Beaver Dam garage.  At his deposition, Boelk testified that 10% of the time he takes no lunch break, 80% of the time he takes an interrupted lunch break and 10% of the time he takes a full lunch break.  Boelk Dep., dkt. #76, at 16-17.  Boelk based these estimates on a two-week "study" he conducted at work in March 2012, after he filed this lawsuit.  At his deposition, Boelk testified that his lunch break was last interrupted two or three weeks earlier when he was at a Subway restaurant and a customer talked to him.  Id. at 64.  Boelk testified that the last time a manager interrupted his lunch break was three or four months earlier.  Id. at 64-65.  On that occasion, Boelk's manager called him, Boelk said he was eating lunch, and his manager said to call back when he was done.  Id.  Boelk has called his manager to get approval to work through lunch on about five occasions.  Id. at 129.  For some time, Boelk's garage supervisor was Duane Amundson.  Amundson told Boelk that he needed to always take a "full lunch" and that he should tell his manager if he worked through lunch.  Id. at 123, 125.


E.  Conversations about Underreporting

In mid-2010, plaintiff Boelk told Peggy Texeira, labor relations manager for

9

defendants, that lunch break restrictions and concerns about efficiency scores "would promote technicians working through lunch." Boelk Decl., dkt. #29, at ¶ 18. Texeira asked Boelk for details about employees who worked through lunch, but Boelk did not provide any. Texeira Decl., dkt. #83, at ¶ 9. During a September 11, 2012 conversation with Texeira, Texeira told Boelk that the company had fired a technician for underreporting his time. Texeira Decl., dkt. #105, at ¶ 3. Boelk responded, "This was exactly what I told you was going to happen two years ago." Boelk Decl., dkt. #99, at ¶ 2. (According to Boelk, Texeira responded, "Yeah, this is nothing new. All the union presidents told me that two years ago." Id. Texeira denies saying this.) Texeira told Boelk that he had never identified any individuals working through their lunch break and that if the company were made aware of it, it would be investigated. Texeira Decl., dkt. #105, at ¶ 7.

The parties dispute whether plaintiff Boelk told his garage supervisor, Amundson, that some technicians were working through their lunches. According to plaintiffs, Boelk told Amundson sometime in 2011 that "technicians" were "working through their lunches and breaks" and Amundson responded that "he knew." Boelk Decl., dkt. #29, ¶ 18. Amundson denies that Boelk ever made this comment to him and denies ever telling Boelk that he knew technicians were working through their lunches. Additionally, he denies knowing of any technician who worked through his lunch break without being paid for it.


OPINION

Plaintiffs are proceeding on claims that defendants violated the Fair Labor Standards

Act and the Wisconsin Wage Payment Act by failing to pay them for work that they performed during their meal breaks.  The parties agree that the standards governing plaintiffs' claims are the same under federal and Wisconsin law.  Dfts.' Br., dkt. #51, at 28; Plts.' Reply Br., dkt. #98, at 11.  Under the FLSA, employers must pay overtime to certain employees who work more than 40 hours in a work week.  29 U.S.C. § 207(a)(1).  Plaintiffs contend that defendants' failure to pay them for the work they performed during their meal breaks resulted in plaintiffs working more than 40 hours each week without receiving overtime compensation.

Defendants have moved for summary judgment on plaintiffs' overtime claims, contending that plaintiffs cannot prove the claims for several reasons.  First, defendants contend that plaintiffs have no evidence that they actually performed "work" during their meal breaks for which they did not receive compensation.  Kellar v. Summit Seating Inc., 664 F.3d 169, 173, 177 (7th Cir. 2011) (plaintiffs bear burden of proving that they performed overtime work for which they were not properly compensated).  In particular, they say that plaintiffs have no evidence that the activities they performed during their lunch breaks were predominantly for the benefit of their employer and thus, compensable.  Leahy v. City of Chicago, 96 F.3d 228, 230, n.2 (7th Cir. 1996) (relevant question is whether employee's attention is "devoted primarily to official responsibilities"); Alexander v. City of Chicago, 994 F.2d 333, 337 (7th Cir. 1993) (relevant question is whether employee devoted time and attention "predominantly for the benefit of the employer").

Second, defendants contend that plaintiffs cannot provide any reasonable estimate

11

of the amount of time they allegedly spent working through lunch, making it impossible to determine whether their alleged work time is compensable as overtime.  Instead, plaintiffs offer only speculation unsupported by any specific facts about working through lunch.

Third, defendants contend that even if plaintiffs could meet their burden of showing that they actually performed overtime work during their lunch breaks, plaintiffs cannot prove that defendants knew anything about it.  Kellar, 664 F.3d at 177 (employee asserting overtime claim has burden to prove that employer "had actual or constructive knowledge of [the] overtime work").

Although all of defendants' arguments appear to have some merit, defendants' argument about their lack of knowledge of plaintiffs' unpaid work is particularly persuasive. Under the FLSA regulations, employers have a duty to "exercise [their] control and see that [] work is not performed if it does not want it to be performed."  29 C.F.R. § 785.13. Employers "cannot sit back and accept the benefits [of an employee's work] without compensating for them."  Id.  However, the FLSA does not "requir[e] the employer to pay for work it did not know about, and had no reason to know about."  Kellar, 664 F.3d at 177; See also 29 U.S.C. § 203(g); 29 C.F.R. § 785.11.  In other words, an employer cannot be held liable for FLSA violations unless it has actual or constructive knowledge of an employee's overtime work.  An employer has "constructive knowledge" under the FLSA when it "had reason to know" or "should have known" that its employee performed uncompensated work.  Kellar, 664 F.3d at 177.  Even if an employer has promulgated a rule against overtime or a procedure to report overtime, the employer may still be liable if it

12

should have discovered by exercising reasonable diligence that its employees were not following the rule.  29 C.F.R. § 785.13; <u>Reich v. Department of Conservation & Natural Resource, State of Alabama</u>, 28 F.3d 1076, 1082 (11th Cir. 1994).  On the other hand, if any employee deliberately prevents the employer from acquiring knowledge of the overtime work, the employer should not be held liable for overtime pay under the FLSA.  <u>Harvill v. Westward Communications, LLC</u>, 433 F.3d 428, 441 (5th Cir. 2008) (if employee "deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of [the FLSA]"); <u>Schremp v. Langlade County</u>, 11-C-590, 2012 WL 3113177, *2 (E.D. Wis. July 31, 2012) (same).

In this case, plaintiffs have adduced no evidence that defendants had actual knowledge that plaintiffs were performing overtime work without compensation.  For example, plaintiffs do not allege that defendants instructed them not to report overtime, told them to delete overtime that they reported on their timesheets or refused to pay them for reported overtime.  <u>E.g.</u>, <u>Brennan v. Quest Communications International, Inc.</u>, 727 F. Supp. 2d 751, 761 (D. Minn. 2010) (denying summary judgment in case in which plaintiffs presented evidence that their employer "insisted that [they] put down a lunch every day . . . even though [they] didn't . . . take a lunch"); <u>Skelton v. American Intercontinental University Online</u>, 382 F. Supp. 2d 1068, 1072 (N.D. Ill. 2005) ("Plaintiffs have testified that they were repeatedly instructed to record on their time sheets only forty hours of work per week, despite the number of hours actually worked, and that if they did report overtime, they were required to change their time sheets before they were submitted."); <u>Cunningham</u>

13

v. Gibson Electric Co., 43 F. Supp. 2d 965, 976 (N.D. Ill. 1999) (defendant's president "personally instructed" plaintiff not to report his overtime hours).  Plaintiffs also have not alleged that their job duties necessarily required them to work overtime hours or that any of their supervisors encouraged them to omit hours from their timesheets.  E.g., Brennan, 727 F. Supp. 2d at 758 (noting that defendant "itself estimated" that plaintiffs' daily assigned workload would require as much as 10 or 11 hours).

Additionally, plaintiffs have not alleged that they told any of their supervisors or managers that they were working during their lunches without reporting it.  E.g., Larbi v. Advocate Christ Medical Center, 10 C 4623, 2012 WL 6019107, *8 (N.D. Ill. Dec. 3, 2012) (denying summary judgment on knowledge issue because plaintiff sent employer notes about working through lunch breaks).  Instead, plaintiffs testified that their supervisors did not know whether they took full, partial or no lunches.  Moffitt Dep., dkt. #73, at 108-10, 123-24 (stating he never made supervisor aware that he was working through lunch and that management would know if he did not have lunch break only if someone happened to be watching him or there was surveillance equipment installed in his truck); Seger Dep., dkt. #71, at 33, 118; (stating that he never told manager what he did or did not do during a lunch break); Congdon Dep., dkt. #72, at 29, 86 (stating that he worked independently); Jacak Dep., dkt. #75, at 151-52 (stating that he did not record when he did not finish his lunch).  By failing to record their hours accurately and failing to tell their supervisors or managers about lunch break work, plaintiffs prevented defendants from having actual knowledge of their off the clock work.  Kellar, 664 F.3d at 178 (affirming judgment for

employer in case in which plaintiff never told her employer she was working overtime and there was "no indication that anyone else knew" plaintiff was performing off the clock work); Forrester v. Roth's I.G.A. Foodliner, Inc., 646 F.2d 413, 414 (9th Cir. 1981) (affirming judgment for employer in case in which plaintiff "testified in his deposition that he 'did not mention any unpaid overtime work to any store official prior to filing his complaint'"); Berger v. Cleveland Clinic Foundation, 1:05 CV 1508, 2007 WL 2902907, *13 (N.D. Ohio Sept. 29, 2007) ("ceasing to keep track of one's missed lunches does not solve the problem of not being reimbursed, but instead precludes the possibility of future reimbursement by preventing the employer from discovering the unpaid work").

Plaintiffs contend that even though they chose voluntarily to underreport their hours without telling any of their supervisors, a reasonable jury could conclude from the evidence in the record that defendants "should have known" that plaintiffs were working unpaid overtime. This evidence includes (1) a 2008 email from a purported company "policymaker" about technicians' lunch activities; (2) the general incentives created by the efficiency system and the lunch restrictions; (3) the "lunch yes or no" designation on the job dispatch system; (4) conversations between plaintiff Boelk and labor relations manager Peggy Texeira; and (5) conversations between Boelk and garage manager Duane Amundson. However, none of this evidence would permit a reasonable jury to find that defendants had actual or constructive knowledge of plaintiffs' alleged unpaid work.

Plaintiffs point to a 2008 email exchange between alleged "corporate policymakers," in which someone named Chris Bennet wrote that he "believe[d] that most techs take their

15

breaks [and] lunches sitting in the cab of their truck during the winter months." Dkt. #139-1. Plaintiffs argue that the email is evidence that defendants knew that plaintiffs worked through their lunch breaks without reporting their time. Plts.' Br., dkt. #131, at 9, 21. As defendants point out, plaintiffs have not authenticated this email or otherwise established that it is admissible evidence. Even if it were admissible, this email raises no issue of fact because it does not show that technicians performed unpaid work during their lunch breaks, let alone that the named plaintiffs performed lunch-break work years after the email was written. Instead, the email suggests only that technicians were taking meal breaks in their trucks. As I concluded in the January 10, 2013 order denying class certification, a lunch break does not constitute work simply because it occurs in the employee's truck. Dkt. #112, at 15, 17-18.

Plaintiffs next argue that defendants should have known that plaintiffs and other technicians would work through their lunch breaks because of the incentives created by the efficiency ranking system and the boredom created by the lunch restrictions. As evidence to support this theory, plaintiffs rely on the expert report of Kevin Murphy, an industrial organizational psychologist. Dkt. #118. Murphy concludes that, in light of defendants' efficiency system and meal break policies, "perform[ing] unreported work during meal breaks is the most likely choice" and that this "rational choice" is "common sense, . . . obvious and foreseeable." Id. at 7.

Murphy's opinions do not create a genuine dispute of material fact regarding defendants' knowledge of plaintiffs' alleged underreporting. First, something that is

"common sense" and "obvious and foreseeable" is not the appropriate subject of expert testimony. Fed. R. Evid. 702 (expert testimony appropriate if based on "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue").  Further, Murphy was asked only to provide a "general scientific overview" relating to defendants' efficiency system and meal break restrictions, but was not asked to offer opinions about the claims of the individual plaintiffs.  Murphy Dep., dkt. #152, at 90-91 ("I was not asked to render an opinion about any specific individual, or about any specific supervisor.").  Murphy admitted during his deposition that to determine how a particular technician would react to restrictions and guidelines would require an understanding of the individual technician's "state of mind in terms of understanding of what the consequences would be positive and negative, of underreporting time taken for lunch."  Id. at 80-81.  Because Murphy's opinion lacks any consideration of facts specific to the named plaintiffs and their own understanding and behavior with respect to defendants' policies, his opinions are too general and speculative to be useful.

Moreover, the evidence in the record does not support plaintiffs' or Murphy's argument that it is "obvious" that the lunch break restrictions and efficiency system would cause employees to work through their lunch breaks.  In some cases, employers may have reason to know that their policies will cause their employees to underreport their time, such as when employees are prohibited from reporting overtime or when it is nearly impossible to complete required work within the time allotted.  There is no evidence of either situation in this case.  Additionally, plaintiffs testified that there were reasons why they might work

17

through their lunch breaks that were unrelated to the efficiency system or the lunch break restrictions, such as interruptions from phone calls or contractors.  In sum, no reasonable jury could not find from the evidence in the record that it should have been "obvious" to defendants that their employees would work through their lunch breaks.

Plaintiffs' argument about the "lunch yes or no" button is also unpersuasive. Plaintiffs contend that the reports sent from the Global Craft Access System to the efficiency system should have put defendants on notice that technicians were not taking lunch breaks because the majority of technicians chose "no lunch" for each job dispatch.  However, plaintiffs have submitted no evidence to support their arguments about the significance of this data. As plaintiffs concede, the default designation on the system is "no," and plaintiffs' own testimony reveals that they rarely used the designation.

Further, plaintiffs submitted no evidence that any supervisor or manager could review the reports generated by the "lunch yes or no" buttons to determine plaintiffs' or any other technician's lunch patterns or that any supervisor attempted to do so.  The button is not related to payroll and does not record whether a technician took a lunch break on any particular day, but instead permits employees to indicate whether they took a lunch break before closing a job so the manager could understand why a job took additional time.  This evidence is insufficient to raise in fact about whether plaintiffs worked during their meal breaks without reporting it.

Plaintiffs' final arguments relating to defendants' knowledge are premised on the conversations between plaintiff Boelk and Peggy Texeira and Duane Amundson.  Boelk says

18

that he told Texeira in 2010 that efficiency rankings "w[ere] going" to cause technicians to work through lunch and that later, in 2012, Texeira admitted that union leaders had warned her about lunch-break work.  He also says that he told Amundson in 2011 that unnamed technicians "were working through their lunches and breaks" and that Amundson responded by saying "he knew."  The parties dispute the substance of these conversations, but even accepting plaintiffs' version of these conversations, neither conversation raises a genuine issue of fact concerning defendants' knowledge of plaintiffs' alleged off-the-clock work.

First, both conversations were vague and provided defendants little information about which technicians were working through their lunch breaks, how frequently they were doing it and why it was occurring.  Notably, Boelk does not allege that he told Texeira or Amundson that technicians were performing *unpaid* work during their lunch breaks.  "[T]he relevant knowledge [for FLSA purposes] is not 'I know that the employee was working,' but 'I know the employee was working and not reporting his time.'"  White v. Baptist Memorial Health Care Corp., 699 F.3d 869, 875 (6th Cir. 2012) (citation omitted).  It is undisputed that if technicians worked through lunch and recorded their time, they would be paid for it.  Additionally, with respect to Amundson, it is undisputed that he instructed his technicians to take a full lunch and that he had given technicians, including Boelk, permission to work through lunch and record that work on their timesheets.  Thus, Amundson's alleged statement to Boelk that he knew technicians were working through their lunch breaks does not establish that he knew or should have known technicians were working without being paid.  Id. at 876-77 (granting summary judgment to defendant because although the

19

employee "occasionally told her supervisors that she was not getting her meal breaks[,] . . . she never told her supervisors that she was not being compensated for missing her meal breaks"); Kellar, 664 F.3d at 177-78 (affirming summary judgment in case in which employer was aware plaintiff punched in early, but had no knowledge that plaintiff was actually conducting work between time she punched in and scheduled start of her shift); Schremp, 2012 WL 3113177, at *4 ("The fact that Plaintiff sometimes performed work outside his regularly scheduled work hours, however, does not mean that the County Board Supervisors knew that he was not being *compensated* for such time.") (emphasis in original); Darrikhuma v. Southland Corp., 975 F. Supp. 778, 783-84 (D. Md. 1997), aff'd, 129 F.3d 1258 (4th Cir. 1997) (although supervisors saw employee working on weekends, they did not know employee was working off the clock).

Moreover, even if it can be inferred that Texeira and Amundson knew that Boelk was referring to unpaid work performed during lunch breaks, those conversations did not place defendants on notice that the five named plaintiffs were working through their meal breaks. Boelk told Texeira and Amundson only that unidentified technicians "would be" or were working through lunch breaks. When Texeira asked Boelk for information on any employee supposedly working through lunch, Boelk failed to identify any particular technician, let alone himself or the other four named plaintiffs. No reasonable jury could draw the inference from this conversation that Texeira knew or should have known that Boelk and the other named plaintiffs had been working overtime without reporting it. With respect to Amundson, he had told Boelk to take full lunches in the past and knew that Boelk had

20

asked permission to work through lunch on previous occasions.  Thus, no reasonable jury could conclude that Amundson should have known Boelk and the other named plaintiffs were among the technicians working through their lunches without reporting it.  Schremp, 2012 WL 3113177, at *4 (supervisors cannot have been expected to know plaintiff sometimes worked after hours without report it in light of fact that plaintiff sometimes worked after hours and did report it); White v. Starbucks Corp., 497 F. Supp. 2d 1080, 1084 (N.D. Cal. 2007) (explaining that although "plaintiff may be able to show a material dispute whether Starbucks had actual or constructive knowledge that *some* store managers sometimes worked off-the-clock, plaintiff has not submitted evidence that Starbucks had actual or constructive knowledge that [*plaintiff*] worked off-the-clock") (emphasis in original); Uhler v. Galesi Management Corp., 3:98-CV-0005-L, 1999 WL 20949, *6 (N.D. Tex. Jan. 8, 1999) (holding that general evidence that employees other than plaintiff were not paid for overtime work was insufficient to create genuine factual dispute regarding whether employer knew plaintiff was not paid for overtime work).

Finally, plaintiffs argue that even if none of the above evidence was sufficient on its own to give defendants actual or constructive knowledge that plaintiffs were working during their meal breaks without recording it, the combination of the 2008 email, the "lunch yes or no" reports, Boelk's conversations with Texeira and Amundson and the incentives created by the efficiency system should have caused defendants to investigate and discover that plaintiffs were underreporting their hours.  Plts.' Br., dkt. #131, at 22 (defendants "had opportunity to acquire specific knowledge of the unpaid work but chose not to").  Plaintiffs

21

contend that defendants could have used its existing GPS system to track technician lunches or could have easily implemented some other system that would have allowed them to track lunches. However, as discussed above, no reasonable jury could conclude that this evidence, alone or in combination, put defendants on notice that plaintiffs were working through their lunch breaks without reporting it.

Additionally, plaintiffs cite no authority for the proposition that defendants were required to change their payroll and tracking practices simply because some technicians were refusing to comply with existing system for reporting overtime work, and I am not persuaded that the law would require that. Hertz v. Woodbury County, Iowa, 566 F.3d 775, 782 (8th Cir. 2009) ("It would not be reasonable to require that the County weed through non-payroll [computer aided dispatch] records to determine whether or not its employees were working beyond their scheduled hours. This is particularly true given the fact that the County has an established procedure for overtime claims that Plaintiffs regularly used."). It is undisputed that defendants' existing system could capture all work time, so long as employees accurately reported all the time they worked. Thus, it would be improper to hold defendants liable for plaintiffs' voluntary failure to comply with reasonable timekeeping procedures, particularly when there is no evidence that defendants discouraged plaintiffs from complying with the system or had any reason to believe plaintiffs would not comply with it. White, 699 F.3d at 876 ("When the employee fails to follow reasonable time reporting procedures she prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA."); Brown v.

ScriptPro, LLC, 700 F.3d 1222, 1230-31 (10th Cir. 2012) ("where the employee fails to notify the employer through the established overtime record-keeping system, the failure to pay overtime is not a FLSA violation").

In sum, "[t]he FLSA's standard for constructive knowledge in the overtime context is whether the [employer] 'should have known,' not whether it could have known." Hertz, 566 F.3d at 782.  Plaintiffs have not produced evidence sufficient to establish either that defendants knew or should have known that they were performing overtime work without compensation.

ORDER

IT IS ORDERED that

1.  The motion to file a sur-reply filed by plaintiffs Rob Boelk, Jerry Seger, Dave Jacak, Greg Congdon and David Moffitt, dkt. #153, is DENIED.

2. The motion for summary judgment filed by defendants AT&T Teleholdings, Inc., Wisconsin Bell, Inc., Ameritech Services, Inc. and AT&T Services, Inc., dkt. #125, is GRANTED.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 19th day of July, 2013.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge